**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No. 15-cv-00955

UNITED STATES OF AMERICA,

    Plaintiff,

v.

ZEN MAGNETS, LLC, and
SHIHAN QU,

    Defendants.

---

**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

---

This matter is before the Court on the United States of America's[1] Motion for a Preliminary Injunction. (Doc. # 2.) The Court received evidence and testimony on this matter in a half-day evidentiary hearing, held on May 11, 2015.[2] For the following reasons, the Court grants the Motion in part.

## I. BACKGROUND

### A. PROCEDURAL HISTORY

Shihuan Qu founded, owns, and operates Zen Magnets, LLC (Zen), a company incorporated in Boulder, Colorado. Zen imports and sells small, powerful ball- and

---

[1] Throughout this Order, the Court refers to the United States as the "CPSC" (i.e., the Consumer Product Safety Commission).
[2] As such, the Court cites to the exhibits admitted at the hearing, not to the exhibits filed with Plaintiff's Motion.

cube-shaped magnets through its website.  These magnets, which are marketed and commonly used as "sculptural" desk toys, have been the subject of considerable attention from federal safety regulators.  In 2010, the Consumer Product Safety Commission (CPSC) began receiving reports of serious injuries caused by small magnets, particularly to young children.  79 Fed. Reg. 59,962, 59,964 (Oct. 3, 2014).  When more than one magnet is ingested, they can interact rapidly and forcefully in the gastointesinal tract, attracting across intestinal tissues.   16 C.F.R. § 1240.5(a)(2).  The magnets can cause perforations and/or blockage, which, if not treated immediately (often with surgery), can be fatal.   *Id.*

In 2012, the CPSC filed administrative complaints against Zen and Star Networks (Star), after each company refused to voluntarily cease sales of magnet sets and to recall those already sold.  The CPSC attempted to settle both complaints.  On July 10, 2014 – during the settlement negotiations between the CPSC and Star – Defendants purchased 917,000 magnets from Star at a substantial discount (the invoice indicates that by paying $5,500 for these magnets, Zen received a "discount" of $40,350).  (Ex. 4.)  The purchase included magnetic cubes that Star marketed as "Magnicube Magnet Cubes" and magnetic spheres that Star marketed as "Magnicube Magnet Balls."  (*Id.*)  For ease of reference, the Court will refer to the magnets purchased in this transaction as "the Star Magnets."

Although the CPSC was unable to settle its complaint with Zen,[3] it did settle with Star, and on July 17, 2014 – just seven days after Zen's purchase of the Star Magnets – Star signed a Consent Agreement providing that it would stop selling magnet sets, recall the magnets it had already sold, and destroy magnets still in its possession. (Ex. 1.)

On August 4, 2014, the CPSC posted a press release on its website, announcing its settlement with Star and containing a link to the Consent Agreement. (Ex. 13.) That same day, Qu posted a statement on Zen's website, noting that "news of Magnicube's settlement comes today," and describing Zen as the "last surviving magnet sphere company still standing, selling, and fighting in the United States." (Ex. ## 5, 5-A.) Zen also posted a link to the Star recall announcement on the CPSC's website. (*Id.*)

Almost immediately after receiving them from Star, Zen repackaged the Star Magnets in its own packaging and rebranded the Magnicube Magnet Cubes as "NewbCubes," and the Magnet Balls as "Neoballs." Additionally, Zen intermixed the Star magnetic balls with its already-existing magnet inventory. (Ex. # 9.) Zen's new packaging for the intermixed magnets contained a warning label on the bag for the magnet tins, a printed warning leaftlet inside of the tin itself, and a small warning on the side of the magnet tin. (Exs. # 18, Ex. F.) On December 1, 2014, Qu posted a statement on Zen's website, stating that "We have Cube Magnets, not by popular

---

[3] The administrative complaint against Zen is currently pending before an Administrative Law Judge (ALJ), after a trial in December of 2014. This administrative complaint does not affect the Star Magnets, as it applies to magnets that were already in Zen's inventory prior to Zen's transaction with Star. Additionally, on October 3, 2014, the CPSC promulgated a Final Rule for Magnet Sets. 16 C.F.R. §§ 1240.1, 1240.3. Similarly, this Rule would not apply to the Star Magnets, as it only applies to magnets that are manufactured or imported after April 1, 2015. *Id.* Zen is currently challenging this rulemaking before the Tenth Circuit. *See Zen Magnets, LLC v. Consumer Prod. Safety Comm'n*, No. 14-9610 (10th Cir. 2015).

demand, but inheritance from fallen comrade.  We'll call them NewbCubes." (Doc. # 2-6.)

After learning that Zen had purchased magnets from Star and was selling them to consumers, on March 4, 2015, the CPSC sent a notice of noncompliance to Qu, requesting that Zen immediately stop its sale of Star Magnets and recall those Star Magnets it had already sold.  (Ex. # 7.)  The notice specifically stated that sale of the Star Magnets violated 15 U.S.C. § 2068(a)(2)(B) and (C), which prohibit the sale of any products that are subject to voluntary corrective action in consultation with the CPSC, or subject to an order issued under the Consumer Product Safety Act, respectively.  (*Id.*)  The notice also stated that continuing to sell or distribute the Star Magnets could result in penalties pursuant to 15 U.S.C. §§ 2068 and 2070.  (*Id.*)

On March 6, 2015, Qu responded to the CPSC's notice through counsel, stating that Zen "cannot" confirm that it had ceased selling the Star Magnets because "the subject product was destroyed, un-branded, and converted to the raw magnets which are a fungible commodity and which are not prohibited as yet to Zen."  (Ex. # 8.)  Qu also asserted that "it is not the commodity magnets themselves that are the subject product of Star Networks, but in fact the combination of magnicube packaging, magnicube advertising, and the high powered commodity magnets that constitute the subject products."  (*Id.*)  In a follow-up letter dated March 20, 2015, Qu's counsel further stated that Zen had already sold the magnetic cubes, but that it was continuing to sell the magnetic balls after commingling them with other magnetic balls.  (Ex. # 9.)

4

On April 3, 2015, the CPSC responded and reiterated its position that notwithstanding Zen's actions in "un-branding" the Star Magnets, Zen was still violating the law, and warned that the CPSC intended to pursue all available legal options, including injunctive relief, to prevent the continued sale of the Star Magnets. (Ex. # 10.) In his reply, dated April 7, 2015, Mr. Qu's attorney restated his position that because Zen had repackaged and rebranded the Star Magnets and "[t]he only component of the product Zen used were the actual magnets that Zen would have received from the magnet factory itself," Zen was not in violation of the Consent Agreement. (Ex. # 11.)

On May 5, 2015, the CPSC filed a Complaint against Defendants, as well as a Motion for Preliminary Injunction. The latter argued that the Court should stop Zen from selling Star Magnets, as well as order Defendants to destroy the Star Magnets in its possession and recall the Star Magnets which were already sold to customers. (Doc. ## 1, 2, 2-14.) This Court held a half-day evidentiary hearing on May 11, 2015.

## II. ANALYSIS

### A. LEGAL STANDARD

The Consumer Product Safety Act (CPSA) empowers the CPSC to bring administrative complaints and conduct rulemaking procedures to protect the public from unreasonable risks of injury from consumer products. 15 U.S.C. §§ 2051(b)(1), 2053. Upon the Commission's request, this Court has jurisdiction to enjoin violations of the CPSA, including by issuing preliminary injunctions "to restrain the distribution in commerce" of products which the Commission has reason to believe present substantial hazards to consumers. 15 U.S.C. §§ 2064(g)(1), 2071(a)(1).

The CPSA explicitly authorizes injunctive relief; thus, the CSPC need not prove all four of the elements traditionally required for a preliminary injunction,[4] because the Act's violation is presumed to cause, for example, irreparable harm. *See Atchison, T. & S. F. Ry. Co. v. Lennen*, 640 F.2d 255, 260 (10th Cir. 1981) (internal citation omitted) ("Where an injunction is authorized by statute it is unnecessary for plaintiff to plead and prove the existence of the usual equitable grounds, irreparable injury and absence of an adequate remedy at law"); s*ee also United States v. Rx Depot, Inc.*, 290 F. Supp. 2d 1238, 1246 (N.D. Okla. 2003) (citing cases). Rather, to obtain a preliminary injunction under these circumstances, the United States has a two-part burden: it must establish that 1) defendants have violated the statute and 2) there exists "some cognizable danger of recurrent violation." *See Roe v. Cheyenne Mountain Conference Resort, Inc.*, 124 F.3d 1221, 1231 (10th Cir. 1997) (citing *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953)).

In determining whether there is a danger of recurrence, a court may consider the *bona fides* of the expressed intent to comply, the effectiveness of the discontinuance, and, in some cases, the character of past violations. *W.T. Grant Co.*, 345 U.S. at 633. Although past misconduct does not lead necessarily to the conclusion that there is a likelihood of future misconduct, it is "highly suggestive of the likelihood of future violations." *Commodity Futures Trading Comm'n v. Wall St. Underground, Inc.*, 281 F.

---

[4] Generally, an injunction may issue where the movant shows: (1) a substantial likelihood of success on the merits; (2) irreparable injury if the injunction is not granted; (3) that injury outweighs any harm the injunction will cause the opposing party; and (4) the injunction is not adverse to the public interest. *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 342 F.3d 1170, 1177 (10th Cir. 2003).

Supp. 2d 1260, 1273 (D. Kan. 2003) (citing *Commodity Futures Trading Comm'n v. Hunt*, 591 F.2d 1211, 1220 (7th Cir. 1979)).  The Court may also consider a defendant's voluntary cessation of challenged practices, the genuineness of a defendant's efforts to conform to the law, and the defendant's progress towards improvement.  *Rx Depot, Inc.*, 290 F. Supp. 2d at 1246 (internal citations omitted).

### B. APPLICATION

The CPSC has met its burden to show that a preliminary injunction is warranted in the instant case: there is a substantial likelihood that Defendants have violated the statute as well as a cognizable danger of recurring violations in the future.

15 U.S.C. § 2068(a)(2)(B) prohibits the sale or distribution of any product that is subject to voluntary corrective action in consultation with the CPSC.  Accordingly, as a preliminary matter, the Court must decide whether the Star Magnets that Zen repackaged, rebranded and sold as "NewbCubes" and "Neoballs," were "subject to a voluntary corrective action" – that is, whether they constituted "subject products" under the Consent Agreement that CPSC signed with Star.  The Consent Agreement defined the "subject products" as "small, individual magnets with a flux index greater than 50 sold under the name Magnicube Magnet Balls . . . and Magnicube Magnet Cubes." (Ex. # 1) (emphasis added).  Defendants argue the "raw" Star Magnets themselves (absent the "Magnicube" packaging and branding) were "fungible commodities" and that Zen's efforts in rebranding and repackaging them, including using different warning labels, meant that they no longer constituted "subject products."

Although this argument appears clever at first blush, it quickly falls apart upon closer examination. The Consent Agreement merely provides the brand name of the magnets for ease of identification, and in no way limits its applicability to products with the "Magnicube" brand or the "Magnicube" warning label. In any case, the Consent Agreement makes clear that the CPSC was not merely concerned with Star's warning labels – it was also concerned with "a substantial risk of injury [that] arises as a result of the Subject Product's operation and use and the failure of the Subject Products to operate as intended." (Ex. # 1 at ¶ 4.) Further, the Agreement notes that its provisions "shall be interpreted in a reasonable manner to effect its purpose to remedy the hazard that the Complaint alleges the Subject Products pose." (*Id.* at ¶ 27.) Accordingly, had the Star Magnets been put to an entirely different use by Zen in a way that "remed[ied] the hazard" – for example, if Zen had melted the magnets down and used the resulting raw material to make entirely different (and safer) products, such as large magnets – it might be "reasonable" to interpret "subject products" such that these substantively altered magnets would no longer be considered to fall within the metes and bounds of the Consent Agreement.

However, it is undisputed that the Star Magnets, even when repackaged with Zen's new warning label, are used by Zen's consumers in precisely the same way they were used by Star's consumers. Therefore, Zen's consumers face precisely the same dangers that Star's consumers faced – dangers which prompted the CPSC to act and bring a complaint against Star in the first instance. Moreover, Defendant's interpretation of "subject products" would effectively gut 15 U.S.C. § 2068(a)(2)(B). Such an

8

interpretation would essentially allow third-party vendors like Zen to circumvent its prohibitions merely by buying and repackaging dangerous products that are subject to voluntary corrective actions in consultation with the CPSC, or subject to an order issued under the CPSA.  As such, the Court concludes that the Star Magnets, notwithstanding Zen's repackaging efforts, constitute "subject products" that are covered by the Consent Agreement and the voluntary corrective action taken by Star in consultation with the CPSC.

In addition to being subject to a voluntary corrective action, 15 U.S.C. § 2068(a)(2)(B) requires that the action be one about which "the Commission has notified the public" or one about which "the seller, distributor, or manufacturer knew or should have known."  In the instant case, it is undisputed that on July 31, 2014, the CPSC notified the public that the Star Magnets were subject to voluntary corrective action, when it posted a press release about its settlement with Star.  (Ex. 13.)  Additionally, it is undisputed that Defendants knew about the settlement with Star – at the latest – as of August 4, 2013, when Qu posted a statement on Zen's website, entitled "We Will Fight Until the End," stating that "news of Magnicube's settlement comes today.  They're . . . out of the fight."  (Ex. 5.)   Indeed, at the preliminary injunction hearing, Mr. Qu testified that not only did he know about the negotiations and the impending settlement agreement between Star and the CPSC when he was negotiating the magnet sale with Star, but also, he knew that the substantial price cut he received was a result of these same negotiations.

Despite this knowledge, however, it is uncontested that Zen intermixed the Star Magnets with its own magnets and continued selling them. As of early May of 2015, Zen had sold all of the "cube" magnets (approximately 114,000), and it had an unknown number of "sphere" magnets remaining (resulting from the intermixing). *See* (Ex. 14) (May 6, 2015 website posting) ("Neoballs are still available while supplies last, or until legally required to stop.") Accordingly, the United States has shown that Zen violated 15 U.S.C. § 2068(a)(2)(B), by selling Star Magnets despite the fact they were subject to a voluntary corrective action with the CPSC.

The Court also concludes that the facts of this case demonstrate a significant "cognizable danger" that Zen will continue to violate the CPSA absent an injunction from this Court. Although Zen knew that there was a risk that it could be found in violation of 15 U.S.C. § 2068(a)(2)(B) for selling the Star Magnets, Zen proceeded to intermix the Star Magnets with Zen's own inventory of magnets and now protests that it has no way to identify which are Star Magnets and which are not. Furthermore, Zen has repeatedly refused to stop selling Star Magnets, even after receiving multiple notices of noncompliance from the CPSC. "[O]ne who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line." *Cf. Boyce Motor Lines v. United States*, 342 U.S. 337, 340 (1952). Similarly, when a defendant persists in its illegal activities "right up to the day of the hearing in the district court . . . the likelihood of futures violations, if not restrained, is clear." *Hunt*, 591 F.2d at 1220 (internal citation omitted). Zen's response to the CPSC evidences its attitude toward voluntary compliance; for example, stating that "Mr. Qu understands CPSC Staff's

position.  Repeating the position does not make it correct." (Ex. 11.)  The fact that a violator has continued to maintain that his conduct was blameless is a relevant factor in considering whether injunctive relief is warranted.  See SEC v. Shapiro, 494 F.2d 1301, 1308 (2d Cir. 1974).  Indeed, far from demonstrating an intent to comply in the future, see W.T. Grant Co., 345 U.S. at 633, when Defendants' counsel asked Mr. Qu if there was anything he would have done differently now in responding to the noncompliance notices, Mr. Qu stated that there wasn't (because "the facts remain the same.")

Moreover, Zen has essentially turned its pledge to continue to defy the CPSC into a marketing campaign.  On August 4, 2014, Zen publically pronounced that it is "now the last surviving magnet sphere company still selling, standing, and fighting in the United States," and vowed "to continue this legal, awareness, and lobbying battle, until our very last drop of cash-flow blood.  We will combat the CPSC's magnet prohibition until triumph, or until a glorious death of insolvency on the legal battlefield."  (Ex. 5.)  As of May 7, 2015, Zen's website stated that "Perhaps it's time to concede: agree to stop selling Neoballs, do the recall, and negotiate as small a penalty as possible… NAH." (Ex. # 14) (ellipses in original).  The probability of future violations may be inferred from past unlawful conduct, Commodity Futures Trading Comm'n v. British American Commodity Options Corp., 560 F.2d 135, 142 (2d Cir. 1977), as well as the character of past violations,  W.T. Grant Co., 345 U.S. at 633.  Because Defendants have openly vowed that they will not stop selling Star Magnets absent an injunction, the Court will take them at their word.

### III. CONCLUSION

The United States has shown that Defendants have violated the CPSA and that there is a cognizable danger of recurrent violation. *See Roe*, 124 F.3d at 1231. As such, it is hereby ORDERED the United States of America's Motion for a Preliminary Injunction (Doc. # 2) is GRANTED in part.[5] It is further ORDERED that Defendants, and each and all of their directors, officers, agents, representatives, employees, attorneys, successors, and assigns, and any and all persons in active concert or participation with any of them (including franchisees, affiliates, and "doing business as" entities), who have received actual notice of the contents of this Order by personal service or otherwise, pursuant to 15 U.S.C. §§ 2064(g)(1), 2071(a)(1), and the inherent equitable authority of this Court, are hereby:

    a.    Enjoined from directly or indirectly selling, offering for sale, or distributing in commerce small magnets with a flux index greater than 50 that Defendants purchased from Star Networks, USA LLC ("Star") on or about July 10, 2014, including but not limited to magnets Defendants sold under the names Neoballs and Newbcubes (hereinafter "the Star

---

[5] In addition to requesting the Court to enjoin future sales of Star Magnets, the CPSC's Motion also requested that the Court order Zen to recall the Star Magnets it has already sold. However, the CPSC was unable to cite legal authority indicating the Court has the power to take this more drastic step. 15 U.S.C. § 2064(g)(1) indicates that the Court may issue a preliminary injunction to "restrain the distribution in commerce" of particular products, and 15 U.S.C. § 2071(a)(1) states that the Court has jurisdiction to "restrain any violation of section 2068 of this title." However, it is not clear whether either statutory provision confers authority to order an individual or entity to **recall** such products. Additionally, the limited purpose of preliminary injunctions is to stop **future** violations – i.e., "merely to preserve the relative positions of the parties until a trial on the merits can be held," *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981), and injunctions that alter the *status quo* are disfavored. *O Centro Espirita*, 389 F.3d at 977. Accordingly, the Court will not order a recall of the Star Magnets at this juncture.

Magnets"). Because Defendants have comingled the Star Magnets with indistinguishable magnets that Defendants obtained from sources other than Star and Mr. Qu testified that there is no way to segregate which magnets are Star Magnets and which are not, all of the comingled magnets that Defendants obtained from sources other than Star shall be included in the definition of the Star Magnets for purposes of this provision and all other provisions of this Order.

b. Ordered to segregate and quarantine of all the Star Magnets in the distribution chain and in inventory in a timely manner. Defendants shall not destroy or dispose of the Star Magnets without prior authorization from CPSC.

c. Ordered to permit CPSC staff to monitor compliance of this Order through unannounced field investigator verification visits to Defendants' place(s) of business.

It is further

ORDERED that this Court retains jurisdiction of this action for the purpose of enforcing or modifying this Order and for the purpose of granting such additional relief as may be necessary or appropriate. It is further

ORDERED that, pursuant to 15 U.S.C. § 2064(g)(2), **this Order shall expire on June 13, 2015,** absent good cause shown for why the Order should be extended, or consent by Defendants to extend the Order.[6]

DATED:   May 14, 2015

TIME:    9:30 AM

BY THE COURT:

*[signature: Christine M Arguello]*

_____
CHRISTINE M. ARGUELLO
United States District Judge

---

[6] 15 U.S.C. § 2064(g), which authorizes the Court to issue a Preliminary Injunction in this matter, does not require the movant to post a bond. Similarly, Rule 65(c) of the Federal Rules of Civil Procedure provides that "The United States, its officers, and its agencies are not required to give security." As such, the Court will not require the CPSC to post a bond.

14