**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No. 15-cv-00955

UNITED STATES OF AMERICA,

      Plaintiff,

v.

ZEN MAGNETS, LLC, and
SHIHAN QU,

      Defendants.

---

**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

---

      This case arose in March of 2015, when Plaintiff, the Consumer Product Safety Commission (the CPSC or the Commission), initially discovered that Defendants were selling sets of small, powerful magnets to consumers, despite the Commission's warnings that such sales were in violation of the Consumer Product Safety Act (CPSA). Specifically, the Commission alleged that Defendants were violating the CPSA because the magnets – which Defendants had purchased from another magnet distributor, Star Networks, USA LLC (Star) – were subject to a recall, following a settlement between the Commission and Star.  (Doc. # 1.)

      On May 14, 2015, this Court granted the Commission's Motion for Preliminary Injunction, enjoining Defendants from "directly or indirectly selling, offering for sale, or distributing in commerce small magnets with a flux index greater than 50 that

Defendants purchased from Star Networks, USA LLC . . . ."  (Doc. # 12 at 12.)  The

CPSC now requests that the Court grant summary judgment in its favor and issue a

permanent injunction in this matter.  (Doc. # 20.)  As discussed in greater detail below,

because there are no genuine issues of material fact regarding whether Defendants

violated the CPSA, the Court grants the instant Motion.

## I.   <u>BACKGROUND</u>

### A.   FACTS

Shihan Qu founded, owns, and operates Zen Magnets, LLC (Zen), a Boulder-

based company that imports, packages, and sells sets of hundreds of small, powerful

magnets through its websites.  (Doc. ## 12 at 1, 2-13 ¶¶ 5–6.)  These magnets, which

are marketed and commonly used as so-called "sculptural" desk toys, have been the

subject of considerable attention from federal safety regulators.  (Doc. # 1, ¶ 1.)  In

2010, the CPSC began receiving reports of serious injuries caused by small magnets,

particularly in young children.  79 Fed. Reg. 59,962, 59,964 (Oct. 3, 2014).  When

multiple magnets are ingested, they are powerful enough to attract rapidly and forcefully

in the gastrointestinal tract, causing tissue perforations and/or blockage of the

intestines.  *See* 16 C.F.R. § 1240.5(a)(2).  If these injuries are not treated immediately,

often with surgery, they can be fatal.  *Id.*

In 2012, the CPSC filed administrative complaints against Zen and Star, after

both companies refused to voluntarily cease their sales of small magnet sets and to

recall those magnet sets they had already sold.  (Doc. # 28-1 at 2–26, 29–54.)  The

CPSC attempted to settle both complaints.  On July 10, 2014 – during the settlement

negotiations between the CPSC and Star – Zen purchased 917,000 individual, small magnets from Star at a substantial discount; the invoice indicates that by paying $5,500 for these magnets, Zen received a "discount" of $40,350, or approximately 88%. (Doc. # 20-1 at 18.)  This purchase included approximately 114,000 magnetic cubes that Star had previously marketed as "Magnicube Magnet Cubes" and approximately 803,000 magnetic spheres that Star had previously marketed as "Magnicube Magnet Balls."  (Doc. ## 20-1 at 30, 55–56; 28, ¶ 2.)  For ease of reference, the Court will refer to the 917,000 magnets Defendants purchased in this July 10, 2014 transaction as "the Star Magnets."

Although the CPSC was unable to settle its complaint with Zen,[1] on July 17, 2014 – just seven days after Zen's purchase of the Star Magnets – Star signed a Consent Agreement settling its administrative complaint with the CPSC.  That Agreement provided that Star would stop selling the "Subject Products," which it defined as "small, individual magnets with a flux index greater than 50 sold under the brand name Magnicube Magnet Balls (Magnicube Spheres) and Magnicube Magnet Cubes (Manicube Cubes) . . . "; recall the Subject Products it had already sold; and destroy Subject Products still in its possession.  (Doc. # 20-1 at 3–14.)  The Consent Agreement also defined Star as a "manufacturer, importer and distributor, as those terms are

---

[1] The administrative complaint against Zen is currently pending before an Administrative Law Judge (ALJ), after a trial in December of 2014.  This administrative complaint does not affect the Star Magnets, as it applies only to magnets that were already in Zen's inventory prior to Zen's transaction with Star.  Additionally, on October 3, 2014, the CPSC promulgated a Final Rule for Magnet Sets.  *See* 16 C.F.R. §§ 1240.1, 1240.3.  Similarly, this Rule does not apply to the Star Magnets, as it only applies to magnets that are manufactured or imported after April 1, 2015.  *Id.* Zen challenged this rulemaking in an appeal that is currently pending before the Tenth Circuit. *See Zen Magnets, LLC v. Consumer Prod. Safety Comm'n*, No. 14-9610 (10th Cir. 2015).

defined in . . . the CPSA, 15 U.S.C. Section 2052(a)[(11)] . . . of Magnicube Spheres and Magnicube Cubes (collectively, the Subject Products)," and noted that the "Subject Products are offered for sale to consumers for their personal use in or around a permanent or temporary household or residence, in recreation or otherwise." (*Id.* at 4.)

Almost immediately after receiving them from Star, Defendants mixed the sphere-shaped Star Magnets with other, indistinguishable sphere-shaped magnets from Zen's existing magnet inventory. (Doc. # 28, ¶ 3; Doc. # 20-1 at 56.) Zen placed this mixture of Star Magnets and other magnets in its own packaging and began selling the intermixed magnetic spheres as "Neoballs." Zen also repackaged the cube-shaped Star Magnets in its own packaging and sold them as "NewbCubes" (no mixture occurred with the cube-shaped Star Magnets because Zen had no cube-shaped magnets in its existing inventory). (Doc. ## 2-9, 2-12; 20-1 at 57; 28, ¶ 4.) However, Zen made no physical changes – such as changes to size, shape, or magnetic flux[2] – to any of the "raw" Star Magnets themselves, prior to placing them in new packaging for sale. (Doc. # 20-1 at 55.)

On August 4, 2014, the CPSC announced its settlement with Star by posting a press release on its website. (*Id.* at 34.) The CPSC's press release also contained a link to the Consent Agreement. (*Id.*) That same day, Qu posted a statement on Zen's website, noting that "news of Magnicube's settlement comes today," and describing Zen as the "last surviving magnet sphere company still standing, selling, and fighting in the

---

[2] Although the CPSC did not define the term "magnetic flux" for the Court, it appears to be a rough synonym for magnetic strength. *See* Final Rule: Safety Standard for Magnet Sets, 79 FR 59962-01, 2014 WL 4925434 (describing "weak magnets" as those "with a flux index 50 kG$^2$ mm$^2$ or less").

United States." (*Id.* at 21.)  Zen's statement also vowed to "continue this legal, awareness, and lobbying battle, until our very last drop of cash-flow blood.  We will combat the CPSC's magnet prohibition until triumph, or until a glorious death of insolvency on the legal battlefield." (*Id.* at 22.)  Additionally, Zen posted a link to the Star settlement and recall announcement on the CPSC's website, as well as a link to the Consent Agreement.  (*Id.* at 21.)

On December 1, 2014, Zen's website posted a statement declaring that "We have Cube Magnets, not by popular demand, but inheritance from fallen comrade.  We'll call them NewbCubes. . . Find and purchase at excellent prices at the bottom of neoballs.com."  (Doc. # 20-1 at 25.)

After learning that Defendants had purchased the Star Magnets and were selling them to consumers, on March 4, 2015, the CPSC sent a notice of noncompliance to Qu, requesting that he and Zen immediately stop their sales of Star Magnets and recall those Star Magnets already sold.  (*Id.* at 27.)  This notice specifically stated that the sale of the Star Magnets violated 15 U.S.C. § 2068(a)(2)(B) and (C), which prohibit the sale of any products that are subject to voluntary corrective action in consultation with the CPSC, or subject to an order issued under the CPSA, respectively.  (*Id.* at 28.)  The notice also stated that continuing to sell or distribute the Star Magnets could result in penalties pursuant to 15 U.S.C. §§ 2068 and 2070.  (*Id.*)

On March 6, 2015, Qu responded to the CPSC's notice through counsel, stating that Zen "cannot" confirm that it had ceased selling the Star Magnets because "the subject product was destroyed, un-branded, and converted to the raw magnets which

5

are a fungible commodity and which are not prohibited as yet to Zen." (Doc. # 2-8.) Qu

also asserted that "it is not the commodity magnets themselves that are the subject

product of Star Networks, but in fact the combination of Magnicube packaging,

Magnicube advertising, and the high powered commodity magnets that constitute the

subject products." (*Id.*) In a follow-up letter dated March 20, 2015, Qu's counsel further

clarified that Zen had already sold all of the cube-shaped Star Magnets, but that it was

continuing to sell the "Neoballs," i.e., the intermixed sphere-shaped Star Magnets

comingled with other, indistinguishable magnetic spheres. (Doc. # 20-1 at 31.)

On April 3, 2015, the CPSC responded to Qu, and reiterated its position that

notwithstanding Zen's actions in purportedly "un-brand[ing]" and "convert[ing]" the Star

Magnets, Zen was still violating the law by continuing to sell the Star Magnets. (Doc. #

20-1 at 32, 33.) It also explicitly warned Defendants that the CPSC intended to pursue

all available legal options, including injunctive relief, to prevent the continued sale of the

Star Magnets, and also noted that Defendants' actions "may result in civil and criminal

penalties." (*Id.*) In his reply, dated April 7, 2015, Mr. Qu's attorney reiterated his

position that because Zen had repackaged the Star Magnets and "[t]he only component

of the product Zen used were the actual magnets that Zen would have received from

the magnet factory itself," Zen was not in violation of the CPSA. (Doc. # 2-11.)

## B.  PROCEDURAL BACKGROUND

On May 5, 2015, the CPSC filed a Complaint in this Court against Defendants

alleging violations of the CPSA. On the same day, it filed a Motion for Preliminary

Injunction, arguing that the Court should stop Defendants from selling the Star Magnets,

as well as order Defendants to destroy the Star Magnets still in their possession and recall any Star Magnets already sold to consumers.  (Doc. ## 1, 2, 2-14.)  On May 11, 2015, the Court held a half-day evidentiary hearing regarding Plaintiff's Motion for a Preliminary Injunction; as of that day, Defendants were still selling the sphere-shaped Star Magnets (i.e., the "Neoballs.")  (Doc. ## 11, 28, ¶ 5.)  At that hearing, Qu admitted that he understood that Star and the CPSC were in the process of negotiating a settlement when he purchased the magnets from Star (indeed, "It was that understanding which made the price low for us").  (Doc. # 20-1 at 48.)  He also admitted that when he agreed to purchase the Star Magnets, he was "aware" that Star was "going to enter into a Consent Agreement" with the CPSC and "it was likely that it would soon illegal to sell Magnicube products." (*Id.* at 52.)  Additionally, Qu testified that he had "responsibility" for Zen's website's postings, and he also acknowledged that he received the CPSC's letters from March 4, 2015 and April 3, 2015.  (*Id.* at 53–54.)

On May 14, 2015, the Court granted in part Plaintiff's Motion for Preliminary Injunction.  (Doc. # 12.)  Although the Court did not order Defendants to recall the Star Magnets from consumers,[3] it did order Defendants to "segregate and quarantine all of the Star Magnets in the [Zen] distribution chain and in inventory in a timely manner," and also enjoined Defendants from "directly or indirectly selling, offering for sale, or distributing in commerce small magnets with a flux index greater than 50 that

---

[3] The Court did not order the recall at that juncture in part because it was unclear whether the CPSA conferred authority to order a recall, but also because "the limited purpose of preliminary injunctions is to stop future violations – i.e., 'merely to preserve the relative positions of the parties until a trial on the merits can be held,' *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981), and injunctions that alter the *status quo* are disfavored."  (Doc. # 12 at 12, n. 5.)  As discussed in Section III(B), *infra*, the Court now determines that it has the statutory authority to order a recall.

Defendants purchased from Star Networks, USA LLC ('Star') on or about July 10, 2014," including the indistinguishable magnets Zen comingled with the Star Magnets during its repackaging.  (Doc. # 12 at 12–13.)  On June 12, 2015, the Court entered an Order preserving the preliminary injunction until this case is decided on the merits. (Doc. # 18.)

The instant Motion requests permanent injunctive relief with respect to the Star Magnets as well as the indistinguishable magnets that Defendants mixed with the Star Magnets when it repackaged the Star Magnets.  For ease of reference, the Court will refer to this group of "intermixed" magnets as the "Repackaged Star Magnets." Specifically, the CPSC requests that the Court (1) permanently enjoin Defendants from selling the Repackaged Star Magnets, offering them for sale, or distributing them in commerce; (2) order Defendants to recall the Repackaged Star Magnets sold prior to May 14, 2015 (i.e., the date of the Court's preliminary injunction) and provide full refunds to consumers who return those magnets pursuant to the recall; and (3) destroy any Repackaged Star Magnets in Defendants' current inventory as well as any Repackaged Star Magnets that are returned in the recall.  (Doc. # 20 at 11–12.)  The Motion also requests that the Court enter summary judgment on its claim that Defendants "knowingly" violated the CPSA in continuing to sell the Repackaged Star Magnets, such that, at a later juncture, the CPSC can recommend a civil penalty and the Court can ultimately impose a penalty pursuant to 15 U.S.C. § 2069(a)(1) & (b).  (*Id.* at 7–11, 15–16.)

## II.   **STANDARD OF REVIEW**

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is "material" if it is essential to the proper disposition of the claim under the relevant substantive law.  *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001).  A dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party.  *Allen v. Muskogee, Okl.*, 119 F.3d 837, 839 (10th Cir. 1997).  When reviewing motions for summary judgment, a court must view the evidence in the light most favorable to the non-moving party.  *Id.*  However, conclusory statements based merely on conjecture, speculation, or subjective belief do not constitute competent summary judgment evidence.  *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

The moving party, the CPSC in the instant case, bears the initial burden of demonstrating an absence of a genuine dispute of material fact and entitlement to judgment as a matter of law.  *Id.*  In attempting to meet this standard, a movant who does not bear the ultimate burden of persuasion at trial does not need to disprove the other party's claim; rather, the movant need simply point out to the Court a lack of evidence for the other party on an essential element of that party's claim.  *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

Once the movant has met its initial burden, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for

trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  The nonmoving party

may not simply rest upon its pleadings to satisfy its burden.  *Id.*  Rather, the nonmoving

party must "set forth specific facts that would be admissible in evidence in the event of

trial from which a rational trier of fact could find for the nonmovant." *Adler*, 144 F.3d at

671.  "To accomplish this, the facts must be identified by reference to affidavits,

deposition transcripts, or specific exhibits incorporated therein." *Id.*

### III.   ANALYSIS

### A.   DEFENDANTS' VIOLATION(S) OF SECTION 2068

The CPSA empowers the CPSC to protect the public from unreasonable risks of

injury from unsafe consumer products, including by bringing administrative complaints

against manufacturers and importers of such products.  15 U.S.C. §§ 2051(b)(1), 2053.

One of the tools in the Commission's regulatory arsenal is 15 U.S.C. § 2068(a)(2)(B)

(Section 2068), which ensures that, if the CPSC settles one of these administrative

complaints, third parties cannot subsequently buy and re-sell the consumer products

that are subject to the settlement.  In other words, Section 2068 allows the Commission

to keep recalled products off the market after a settlement occurs.  Specifically, Section

2068 makes it unlawful for any person to "sell, offer for sale . . . [or] distribute in

commerce" any consumer product that is "subject to voluntary corrective action taken by

the manufacturer, in consultation with the Commission, of which action the Commission

has notified the public or if the seller, distributor, or manufacturer knew or should have

known of such voluntary corrective action."  15 U.S.C. §§ 2068(a)(2)(B).

In order for this Court to issue permanent injunctive relief pursuant to 15 U.S.C. § 2071(a)(1),[4] the CPSC must demonstrate there are no genuine issues of material fact as to Defendants' violation of Section 2068.[5]  The CPSC argues, and this Court agrees, that it has met this burden.  Indeed, Defendants' Response to the instant Motion expressly admits every fact that is material in determining whether they violated section 2068 of the CPSA.  Specifically, Defendants admit they (1) offered for sale and sold a consumer product (2) subject to voluntary corrective action taken by the manufacturer (3) of which the Commission had notified the public.  The Court fully addresses each of these elements in turn below.

## 1. Zen offered for sale and sold "a consumer product"

In its Response to the instant Motion, Zen admits that the Repackaged Star Magnets involved here are consumer products, and that it sold them between December of 2014 and May 11, 2015.  Specifically, by March 20, 2015, Zen had sold all 114,000 of the magnetic cubes it purchased from Star.  As of May 11, 2015, Zen was still selling the Repackaged Star Magnets spheres, and had a remaining inventory of approximately 500,000 of such magnets.  Accordingly, there is no dispute that the Repackaged Star Magnets were "consumer products" sold by Defendants.

---

[4] 15 U.S.C. § 2071(a)(1) provides that the United States District Courts have jurisdiction to "restrain any violation of section 2068 of this title."

[5] In addition to alleging that Defendants violated Section 2068(a)(2)(B), the CPSC's Complaint also alleged that Defendants violated 15 U.S.C. § 2068(a)(2)(C), which prohibits the sales, import, or distribution in commerce of any consumer product that is "subject to an order issued under section 12 or 15 of this Act."  (Doc. # 1.)  The instant Motion did not address this violation, and the CPSC has indicated that if the Motion is granted on its Section 2068(a)(2)(B) claim, it "does not intend to pursue the § 2068(a)(2)(C) claim."  (Doc. # 20 at 4, n.2.)

**2. Zen offered for sale and sold consumer products that were "subject to a voluntary corrective action taken by the manufacturer, in consultation with the Commission"**

On July 17, 2014 – seven days after Zen's purchase of the Star Magnets – Star signed the Consent Agreement with the CPSC, providing that Star would stop selling the "Subject Products," recall those Subject Products it had already sold, and destroy any Subject Products that were still in its possession.  (Doc. # 20-1 at 3–14.)  The Consent Agreement also defined Star as a "manufacturer."[6]  (*Id.* at 4.)

Zen admits facts sufficient to establish it sold consumer products (i.e., the Repackaged Star Magnets) that were, in fact, "Subject Products" under the Consent Agreement with Star – i.e., products subject to the CPSC's voluntary corrective action. First, Zen admits that the magnets it purchased from Star on July 10, 2014, were sold under the brand name "Magnicube."  Zen also admits that, just seven days after it purchased these Magnicube-brand magnets from Star, "Star signed a Consent Agreement with CPSC in which Star agreed to a voluntary corrective action to recall the magnets it sold under the brand name Magnicube."  Finally, Zen admits it sold the Star Magnets to consumers, albeit under its own brand names ("Neoballs" and "NewbCubes.")  These admissions establish there is no factual dispute that Zen violated the second "element" of section 2068.

Despite these admissions, Zen argues that genuine issues of material fact remain as to whether the Consent Agreement's definition of "Subject Products" includes the Repackaged Star Magnets.  (Doc. # 28 at 8.)  However, even drawing all

---

[6] The CPSA defines a "manufacturer" as "any person who manufactures **or imports** a consumer product."  15 U.S.C. § 2052(a)(11) (emphasis added).

reasonable inferences in Zen's favor, the Court is not persuaded that there are genuine disputes on this score, i.e., that a "rational trier of fact could resolve th[is] issue either way."  *See Adler*, 144 F.3d at 670.  As discussed in greater detail below, each of Zen's arguments to the contrary constitute irrelevant smokescreens or are premised on an unreasonable reading of the Consent Agreement and/or the CPSA.

Zen first asserts that the plain language of the Consent Agreement indicates that the "Subject Products" were **wholly defined** by their Magnicube marketing, branding, and packaging **as Magnicube magnets**; in other words, the "raw" Star Magnets themselves – absent this marketing, branding, and packaging as so-called "Magnicubes" – were not "Subject Products."  (*See* Doc. # 28 at 9–14.)  However, the Consent Agreement does not define the "Subject Products" in this narrow fashion; instead, the full definition reads as follows:

> The Subject Products are small, individual magnets with a flux index greater than 50 sold under the brand name Magnicube Magnet Balls (Magnet Spheres) and Magnicube Magnet Cubes (Magnicube Cubes). The Subject Products were introduced into commerce sometime after August 2010.  Star Networks is a manufacturer, importer and distributor . . . of Magnicube Spheres and Magnicube Cubes (collectively, the Subject Products).  The Subject Products are offered for sale to consumers for their personal use in or around a permanent or temporary household or residence, in recreation or otherwise.

(Doc. # 20-1 at 3, ¶ 3.)  As is evident from its plain language, this definition in no way ties the identity of the "Subject Products" to the branding, labeling, or marketing of those "Subject Products," nor does it otherwise limit the Consent Agreement's applicability to products with the "Magnicube" brand, packaging, or warning label.  Rather, the definition simply **specifies** that the "small, individual magnets with a flux index greater

than 50" to which it refers are those magnets "**sold under the brand name** Magnicube

Magnet Balls and Magnicube Magnet Cubes (Magnicube Cubes)." *Id.* (emphasis

added).  As the CPSC notes, this kind of "identifying" information is necessary precisely

so that other retailers – like Zen – can determine which products are included in a

Consent Agreement.  (Doc. # 29 at 5.)

　　　In any case, the Consent Agreement specifically notes that its provisions "shall

be interpreted in a reasonable manner to effect its purpose to remedy the hazard that

the Complaint alleges the Subject Products pose."  (Doc. # 20-1 at 11, ¶ 27.)  To this

end, the Consent Agreement makes clear that the hazards alleged in the Complaint

were not confined to Star's warning labels or branding, but rather, also involved the

magnets themselves – specifically, the "substantial risk of injury [that] arises as a result

of the Subject Product's **operation and use** and the **failure of the Subject Products**

**to operate as intended**."  (Doc. # 20-1 at 3, ¶ 4) (emphasis added).  Likewise, the

administrative Complaint the CPSC brought against Star not only alleged that Star's

warnings and packaging were inadequate and defective, but also that the magnets, **in**

**and of themselves**, "contain[ed] defects in design that pose a substantial risk of injury."

(Doc. # 20-1 at 50, ¶¶ 123, 124.)  Especially when the language of the Subject

Agreement is construed reasonably, with an eye toward "effecting its purpose to remedy

the hazard" – that is, the hazard that is the "operation and use" of the Star Magnets – it

is clear that the "raw" Star Magnets were, in fact, encompassed in the "Subject

Products" which were governed by the Consent Agreement.

In a similar vein, Defendants contend that they did not violate the Consent Agreement because, without the Star packaging and warning labels, the "raw" Star Magnets were identical in every respect to magnets Defendants were legally permitted to sell at that juncture,[7] such that Defendants' remarketing, rebranding, and repackaging of the Star Magnets with Zen's own packaging and warnings effectively rendered the Star Magnets "a fundamentally different product" from that of the Subject Products. (Doc. # 28 at 6–8, ¶¶ 2, 8; 12–13.)  These arguments are at once irrelevant and explicitly belied by the evidentiary record.  The Consent Agreement governs a discrete "universe" of "Subject Products": in this case, 917,000 small magnets with a flux index greater than 50 that were introduced into commerce "sometime after August 2010" by Star, under the brand names "Magnicube Magnet Balls" and "Magnicube Magnet Cubes."  That Zen could lawfully sell **other** magnets it obtained elsewhere, even magnets that were **identical in every single respect** to the Star Magnets, is utterly irrelevant to the relatively simple issue before the Court, to wit: whether Zen sold particular magnets that were included in the Consent Agreement between Star and the CPSC.  Moreover, Qu expressly admitted that Defendants did nothing to **physically alter** the Star Magnets before re-selling them; that is, they did not melt the Star Magnets down or otherwise change their shape, size, or magnetic flux.  (Doc. # 20-1 at 54.)

---

[7] Sales of **all** small magnets with a flux index of greater than 50 subsequently became unlawful after April 1, 2015; as of that date, "each magnet in a magnet set, and any individual magnet . . . must have a flux index of 50 kG$^2$ mm$^2$ or less . . . ."  *See* 16 C.F.R. §§ 1240.1, 1240.3.  This is the safety standard that Defendants are currently challenging before the Tenth Circuit.

Regardless, Zen's argument that its new packaging and warnings somehow rendered the "raw" Star Magnets to be "fundamentally different products" is ultimately a red herring: neither the CPSA nor section 2068 contain some sort of "loophole" or a "safe harbor" permitting the sale of "any consumer product that is subject to voluntary corrective action" so long as the seller purportedly addresses the hazard that led the CPSC to take action in the first place (for example, in providing new or different packaging, warnings, etc.).[8]  Instead, the CPSA prohibits – **full stop** – any person from "sell[ing], offer[ing] for sale . . . [or] distribut[ing] in commerce" any consumer product that is "subject to voluntary corrective action . . . ."  15 U.S.C. §§ 2068(a)(2)(B). Accordingly, as of July 17, 2014, the date the Consent Agreement was signed, the Star Magnets were "Subject Products" under the Consent Agreement, and Defendants' repackaging is immaterial to its violation(s) of Section 2068.

Zen also argues the Star Magnets were not "Subject Products" because Star never actually admitted that the Star Magnets were hazardous or defective in the Consent Agreement.  Again, this argument simply misses the point; there is no requirement in Section 2068 that the manufacturer make such an admission, and the narrow issue presented by the instant litigation is whether Defendants sold products that

---

[8] Indeed, Defendants' interpretation would allow manufacturers and importers of consumer products to simply circumvent (and effectively disarm) Section 2068, by merely repackaging recalled products as they saw fit.

16

were subject to the Consent Agreement – **not** whether those products did, in fact, present a substantial product hazard.[9]

### 3. The CPSC "notified the public" of the voluntary corrective action with Star and Defendants "knew or should have known" of the voluntary corrective action with Star.

Defendants admit that the CPSC notified the public about the voluntary corrective action to recall the Star Magnets.  Specifically, they do not contest that CPSC effectively notified the public of the Consent Agreement through its website.  They also do not contest that Zen itself knew about the Consent Agreement; indeed, Zen posted a link to the Agreement on its own website.  (Doc. # 28 ¶¶ 11–12.)  Accordingly, there are no disputed issues as to this third "element" of Section 2068.

### 4. Defendants violated Section 2068

In sum, because there are no disputed issues of material fact that Defendants sold and offered for sale consumer products that were subject to the Consent Agreement between Star and the CPSC about which the CPSC had notified the public (and about which Defendants were aware), the CPSC is entitled to summary judgment on its claim that Defendants violated Section 2068.  Concomitantly, the CPSC is also entitled to permanent injunctive relief, enjoining Defendants from selling the Repackaged Star Magnets, offering the Repackaged Star Magnets for sale, or distributing the Repackaged Star Magnets in commerce.[10]

_____

[9] Additionally, Zen asserts that the language of the Consent Agreement, when read in conjunction with the Complaints the CPSC filed against Star, demonstrates that the "Subject Products" of the Consent Agreement were different from the Star Magnets.  However, it does not even quote the relevant language of the relevant Complaints, much less **explain** how this language is supportive of its argument (*see* Doc. # 28 at 9–14) – nor can the Court, after carefully examining the Complaints, surmise how the language would be supportive.

### B.   THE SCOPE OF PERMANENT INJUNCTIVE RELIEF: RECALL

In addition to requesting a permanent injunction enjoining Defendants from selling or otherwise distributing the Repackaged Star Magnets, the CPSC also requests that the Court order Defendants to recall those Repackaged Star Magnets they have already sold to consumers and provide those consumers a full refund.  15 U.S.C. § 2071(a)(1) (Section 2071) provides that this Court has jurisdiction to "restrain any violation of section 2068 of this title."  The CPSC acknowledges that there is no case law interpreting the scope of relief permitted by Section 2071, but argues that the Court has the authority to order a recall here because the United States Supreme Court, the Tenth Circuit Court of Appeals, and other courts have approved of so-called "backward-looking" remedies when interpreting equivalent injunction authority in other statutes. (*See* Doc. # 20 at 12.)  The Court agrees.

In *United States v. Rx Depot, Inc.*, 438 F.3d 1052, 1053 (10th Cir. 2006), the Tenth Circuit analyzed whether the district court had the authority to order disgorgement of the defendant's profits as a remedy for the defendant's violations of the Federal

---

[10] The Court fully recognizes that the magnets Defendants mixed with the Star Magnets were not Subject Products.  Accordingly, in the ordinary case, the Star Magnets would be the only products subject to this Court's permanent injunction.  However, Defendants' own, voluntary conduct has made it impossible to segregate the Star Magnets for purposes of the permanent injunction.  Specifically, Defendants willingly took a risk to intermix the Star Magnets with **indistinguishable** magnets of their own – despite their full knowledge of the Consent Agreement between Star and the CPSC subjecting the Star Magnets to a recall.  Accordingly, these other, indistinguishable magnets must also be included in this injunction, in order for it to effectively prevent the sales of the Subject Products.  *Cf. Boyce Motor Lines v. United States*, 342 U.S. 337, 340 (1952) ("[O]ne who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line"); *Swann v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 1, 15 (1971) ("Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies.").

Food, Drug and Cosmetic Act (FDCA). The FDCA provides that "[t]he district courts of the United States . . . shall have jurisdiction, for cause shown to restrain violations of [the FDCA]." 21 U.S.C. § 332(a). In ultimately deciding that the "arguably backward-looking" remedy of disgorgement was, indeed, permitted under that statutory provision, the Tenth Circuit noted that

> When Congress invokes the general equity jurisdiction of courts in a statute, "**all the inherent equitable powers of the [courts] are available for the proper and complete exercise of that jurisdiction**," unless the statute, by "clear and valid legislative command" or "necessary and inescapable inference," restricts the forms of equitable relief authorized.

*Rx Depot*, 438 F.3d at 1054–55 (emphasis added) (quoting *Porter v. Warner Holding Co.,* 328 U.S. 395, 398 (1946)); *see also Mitchell v. Robert De Mario Jewelry, Inc.*, 361 U.S. 288, 291–92 (1960) (holding that the Fair Labor Standards Act's language granting federal courts jurisdiction "for cause shown, to restrain violations of [the FLSA]," permitted the remedy of reimbursement of past lost wages by plaintiff-employees, and noting that "[w]hen Congress entrusts to an equity court the enforcement of prohibitions contained in a regulatory enactment, it must be taken to have acted cognizant of the historic power of equity to provide complete relief in the light of statutory purposes"); *Swann v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 1, 15 (1971) ("Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies."). In *Rx Depot*, the Tenth Circuit also noted that the case was brought by the United States under the FDCA, and that when a case is brought "by the government to protect the public health and safety, [the] courts' equitable jurisdiction under the statute 'assume[s]

19

an even broader and more flexible character.'"  438 F.3d at 1058 (second brackets in original) (quoting *Porter*, 328 U.S. at 398).

The Court has thoroughly examined the CPSA and determined that it does not, either by "clear and valid legislative command" or "necessary and inescapable inference," restrict the forms of equitable relief authorized therein.  *See id.* at 1061. Although Section 2071 uses the term "restrain" – which arguably implies that any remedy should be limited to future or ongoing violations – in *Rx Depot*, the Tenth Circuit specifically held that the use of this term (which was also used in the FDCA) is "not dispositive evidence of Congress' intent to limit remedies to those that are forward looking."  *See id.* at 1058 (citing *Mitchell*, 361 U.S. at 296.)  Similarly, the CPSA has other, express remedy provisions, such as 15 U.S.C. § 2072, which permits any person injured as a result of a knowing violation of a consumer product safety rule to bring suit to recover damages and attorney fees.  However, in *Rx Depot*, the Tenth Circuit also held that merely because a statute provides express provisions for other remedies, such as provisions allowing private individuals to file civil suits, such provisions are not, in and of themselves, indications that Congress intended to exclude other remedies or restrict a court's general equitable jurisdiction.  438 F.3d at 1058.

It also bears mention that the instant case was brought by the Government pursuant to the CPSA, which is designed to protect the public's health and safety from "unreasonable risks of injury associated with consumer products."  15 U.S.C. § 2051(b)(1); *see also United States v. Mirama Enters., Inc.*, 387 F.3d 983, 986 (9th Cir. 2004) (noting that the CPSA "establishes a complex regulatory framework for keeping

dangerous consumer products out of the marketplace – and away from the fingers, hands and other body parts of consumers.")  Accordingly, the Court's "equitable jurisdiction under the statute 'assume[s] an even broader and more flexible character.'" *Rx Depot,* 438 F.3d at 1058.  Moreover, ordering a recall as part of an injunctive remedy would be perfectly consistent with the purposes of the CPSA, and Section 2068 in particular.  Indeed, ordering a defendant to allow consumers to return products that have already been subject to an agreed-upon recall will reduce the likelihood that such consumers are injured by those products, and it will also deter future violations of the CPSA by forcing a defendant to issue refunds – including, necessarily, any profits it gained from illegally selling recalled products – to consumers.  *See id.* at 1061 ("To be sure, the public health is protected not only by halting current violation of the Act, but also by deterring future violations.  Disgorgement, which deprives wrongdoers of their ill-gotten gains, deters violations of the law by making illegal activity unprofitable"); *Porter*, 328 U.S. at 400 ("Future compliance may be more definitely assured if one is compelled to restore one's illegal gains.")

In sum, like the FDCA, the CPSA invokes the Court's general equity jurisdiction to "restrain any violation of section 2068 of this title," and this jurisdiction not restricted by the text of the statute (or otherwise).  Moreover, this case was brought by the Government under a statute designed to protect public safety, and a recall furthers the purposes of the CPSA by deterring future violations of the Act, in the interest of protecting public health and safety.  Accordingly, applying *Rx Depot*, the Court determines that Section 2071's grant of general equitable jurisdiction – i.e., the

jurisdiction to "restrain any violation of section 2068 of this title" – authorizes traditional equitable remedies, which, as applied here, include the arguably backward-looking remedy of a product recall.  *See United States v. Livdahl*, 356 F. Supp. 2d 1289, 1295 (S.D. Fla. 2005) (preliminary injunction issued pursuant to FDCA required defendant to recall violative products); *United States v. Lane Labs-USA, Inc.*, 324 F.Supp.2d 582, 586 (D.N.J. 2004) (permanent injunction issued pursuant to FDCA required defendant to pay restitution to consumers who purchased violative products, which included "the full amount paid by the purchaser, including any shipping and handling costs"); *United States v. Union Cheese Co.*, 902 F. Supp. 778, 789-91 (N.D. Ohio 1995) (permanent injunction issued pursuant to FDCA gave government the authority to recall contaminated products and ordered defendant to destroy contaminated products).  As such, the Court will order Defendants to recall the Repackaged Star Magnets, as described in greater detail in the conclusion of this Order.

## C.    CIVIL PENALTIES

Pursuant to 15 U.S.C. § 2069(a) (Section 2069), this Court may assess civil penalties against Defendants for "each . . . violation" of section 2068 that was "knowingly" committed.  The instant Motion does not request that the Court determine the number of violations committed here, nor the precise amount of civil penalties; rather, it requests that the Court analyze whether Defendants "knowingly" committed their violation(s) of Section 2068 and notes that, if the Court makes this determination, the CPSC will submit further briefing regarding the particular civil penalty it recommends.  Regrettably, Defendants utterly failed to respond to the CPSC's

arguments regarding civil penalties; however, it is clear from their Response that they would argue that they could not have possessed the requisite knowledge because "Defendants were operating under a good faith belief that they were complying with the Consumer Product Safety Act" in repackaging the Star Magnets and selling them.  (*See* Doc. # 28 at 6, 12–14.)

Section 2069 defines "knowingly" as "(1) the having of actual knowledge, or (2) the presumed having of knowledge deemed to be possessed by a reasonable man who acts in the circumstances, including knowledge obtainable upon the exercise of due care to ascertain the truth of representations."  15 U.S.C.A. § 2069(d).  Defendants' admissions establish the requisite knowledge to meet this standard, in particular, the standard outlined in Section 2069(d)(2).[11]  Specifically, at the preliminary injunction hearing, Qu admitted that when he bought the Star Magnets, he was "aware" that (1) a Consent Agreement between the CPSC and Star was imminent (as well as the reason for the 88% discount he received on the Star Magnets), and (2) "it was likely that it would soon be illegal to sell Magnicube products."  (Doc. # 20-1 at 48.)  Qu also admitted that he was "responsible" for the postings on Zen's website, and on the same day that the CPSC posted a press release on its website announcing its settlement with Star, Zen also posted a statement on its website noting that "news of Magnicube's settlement comes today."  (*Id.* at 21.)  Indeed, the Zen posting even contained a link to the Consent Agreement.  (*Id.*)  Moreover, Qu admitted that despite his knowledge of Consent Agreement, Defendants did not bother to segregate the Star Magnets from the

---

[11] The Court cannot cite case law in support of this determination because there are no cases – published or unpublished – applying Section 2069(d).

other magnets at Zen's warehouse; rather, Defendants simply started mixing the Star Magnets with their own, indistinguishable magnets, and selling the Repackaged Star Magnets immediately.  (Doc. # 14 at 74–75.)[12]  Qu also admitted that he received the CPSC's letters dated March 4, 2015, and April 3, 2015, notifying him that the sale of the Star Magnets violated 15 U.S.C. § 2068(a)(2)(B).  (*Id.* at 53–54.)  Nevertheless, in the face of both the Consent Agreement and these multiple, specific warnings, Defendants still continued to sell the Star Magnets, and even did so after the CPSC filed its Complaint; specifically, they did so until this Court issued an injunction to stop them, on May 11, 2015.

These admissions – and Defendants' continued sales in light of multiple warnings from the CPSC – plainly demonstrate that even if Qu did not have "actual knowledge" that the Star Magnets were, indeed, subject to a Consent Agreement when Zen resold them, he certainly was provided with enough notice from the CPSC to trigger his responsibility as a "reasonable man . . . act[ing] in the circumstances" to obtain "knowledge . . . upon the exercise of due care[,] to ascertain the truth of [the CPSC's]

---

[12] The following exchange occurred regarding this issue at the preliminary injunction hearing:

> **THE COURT:**  Why did you intermix the Star Neoballs with your own inventory? . . . You knew there was this litigation going on with the Commission.  Why would you intermix them?"
> **THE WITNESS [MR. QU]:**  So you ask that question from the frame of mind that I see these magnets differently; that I think those might be a risk to me and I should perhaps keep them separate. But, in fact, they are completely fungible, in same way that nuts and bolts often are. So, to me, they are the same things.
> **THE COURT:**  I know to you, but you knew there was a litigation going on. I am sitting here going, why would he take the risk?
> **THE WITNESS [MR. QU]:** I didn't think it was a risk.

(Doc. # 14 at 74–75.)

representations" that the Star Magnets were, in fact, included in the Consent Agreement as "Subject Products."   *See* 15 U.S.C.A. § 2069(d)(2).   To put it slightly differently, even if Defendants believed (as Qu testified) that the removal of the Star Magnets from their original packaging somehow also removed them from the purview of the Consent Agreement, Defendants **did nothing,** much less "exercise[d] due care," to confirm (or disprove) this fact and ensure that they were not violating Section 2068.   To the contrary, they simply ignored the CPSC's repeated warnings and continued selling the Star Magnets – even after the CPSC explicitly warned that Defendants' so-called "unbranding" and "repackaging" strategy was, in its view, still in violation of the CPSA. Accordingly, the CPSC has carried its burden to show that Defendant's violations of Section 2068 were "knowing" for the purposes of the CPSA's civil penalty provisions, and the CPSC is entitled to summary judgment on this claim.

## IV.   <u>CONCLUSION</u>

In accordance with the above, the Court GRANTS Plaintiff's Motion for Summary Judgment.  (Doc. # 20.)  As such, pursuant to 15 U.S.C. § 2071(a)(1) and the inherent equitable authority of this Court, Defendants, and each and all of their directors, officers, agents, representatives, employees, attorneys, successors, and assigns, and any and all persons in active concert or participation with any of them (including franchisees, affiliates, and "doing business as" entities), who have received actual notice of the contents of this Order by personal service or otherwise, are hereby:

    a.  Permanently enjoined from directly or indirectly selling, offering for sale, or distributing in commerce small magnets with a flux index greater than 50 that

Defendants purchased from Star Networks, USA LLC ("Star") on or about July 10, 2014, including but not limited to magnets Defendants sold under the names Neoballs and Newbcubes (hereinafter "the Star Magnets").  Because Defendants have comingled the Star Magnets with indistinguishable magnets that Defendants obtained from sources other than Star, and because there is no way to segregate the Star Magnets from these other, indistinguishable magnets, all of the comingled magnets that Defendants obtained from sources other than Star and intermixed with the Star Magnets shall be included in the definition of "Star Magnets" for purposes of this provision and all other provisions of this Order;

b. Ordered, within seven days of the date of this Order, to post notice of this Order on its website.  Defendants shall maintain the notice on its website for two years following the date of this Order.  The notice shall contain a link to the announcement of this Order on the CPSC's webpage.  The notice shall advise the public that Defendants shall issue full refunds to consumers who return the Star Magnets (including prorated refunds if consumers do not return full sets of magnets);

c. Ordered to provide consumers who return a full set of the Star Magnets a full refund for the purchase price of the Star Magnets, and to provide consumers who return less than a full set of the Star Magnets a refund that is prorated based on the percentage of Star Magnets returned;

d. Ordered, within seven days of the date of this Order, to announce the notice described in subparagraph (b) through all social media accounts Defendants maintain, including but not limited to any Facebook or Twitter accounts;

e. Ordered, within three weeks of the date of this Order, to email the notice described in subparagraph (b) above to all consumers who purchased Star Magnets from Defendants;

f. Ordered, within one week of the date of this Order, to provide a copy of this Order, by personal service or certified mail (restricted delivery, return receipt requested) to each and all of its directors, officers, agents, representatives, employees, attorneys, successors, and assigns, and any and all persons in active concert or participation with any of them (including franchisees, affiliates, and "doing business as" entities), and any other parties involved in the sale, offering for sale, manufacture, distribution in commerce, or import into the United States of the Star Magnets (hereinafter, collectively referred to as "Associated Persons");

g. Ordered, in the event Defendants become associated, within two years after the date of this Order, with new Associated Person(s), Defendants shall within ten (10) business days after the commencement of such association: (a) provide a copy of this Order to each such Associated Person(s) by personal service or certified mail (restricted delivery, return receipt requested); and (b) provide to CPSC staff an affidavit stating the name and manner of compliance with this subparagraph, identifying the names, addresses, and positions of all

persons or entities who received a copy of this Order pursuant to this

subparagraph, and attaching copies of the executed mail return receipts;

h.   Ordered to destroy or dispose of all the Star Magnets in the distribution chain

and in inventory in a timely manner approved by CPSC staff, including those

Star Magnets returned in the consumer recall described in subparagraph (c),

provided however that Defendants shall notify CPSC staff prior to the

destruction or disposal of the Star Magnets so that CPSC staff may witness

such destruction or disposal.  Defendants shall take all necessary steps prior

to destruction or disposal to ensure quarantine of all the Star Magnets so as

to prevent reentry into the stream of commerce;

i.   Ordered to permit CPSC staff to monitor compliance of this Order through

unannounced field investigator verification visits to Defendants' place(s) of

business; and

j.   Restrained and enjoined from directly or indirectly doing or causing to be

done any act that violates 15 U.S.C. § 2068(a)(2)(C).

It is further

ORDERED that this Court retains jurisdiction of this action for the purpose of

enforcing or modifying this Order and for the purpose of granting such additional relief

as may be necessary or appropriate.  It is further

ORDERED that the CPSC should submit briefing to this Court, on or before

4/6/2016, regarding its recommendation as to civil penalties, pursuant to 15 U.S.C. §

2069(a) & (b).  Defendants are ordered to respond to this briefing within two weeks after the CPSC's submission.  It is further

ORDERED that the parties are to confer among themselves to schedule a date for a hearing regarding civil penalties, and email Chambers jointly to request a hearing setting (arguello_chambers@cod.uscourts.gov), as described in CMA Civ. Practice Standard 1.2(a).

DATE:        March 22, 2016

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
United States District Judge